## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| ALEXANDER Y. USENKO, Derivatively on Behalf of the SunEdison Semiconductor Ltd. Retirement Savings Plan, <br><br>         Plaintiff, <br><br>     vs. <br><br> SUNEDISON SEMICONDUCTOR, LLC, THE INVESTMENT COMMITTEE OF THE SUNEDISON SEMICONDUCTOR RETIREMENT SAVINGS PLAN, and JOHN DOES 1-10, <br><br>         Defendants. | Civil Action No.:  4:17-cv-2227 |

## **COMPLAINT**

1.     Plaintiff Alexander Y. Usenko ("Plaintiff"), derivatively on behalf of the SunEdison Semiconductor Retirement Savings Plan (the "Plan"), brings this action in a derivative capacity against the below-named defendants (collectively "Defendants") pursuant to §§ 404, 405, 409, and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1104, 1105, 1109, and 1132.

2.     All allegations contained herein are based upon personal information as to Plaintiff and the investigation of Plaintiff's counsel, including, but not limited to, a review of publicly filed documents, or upon information and belief, where indicated.  It is likely that, once discovery begins in earnest, the roles of additional persons or entities in the wrongdoing alleged below will be revealed and the wrongdoing itself will be further illuminated.  In that event, Plaintiff will seek to amend this Complaint to add new parties and/or claims in accordance with the Federal Rules of Civil Procedure and this Court's rules.

## NATURE OF THE ACTION

3.      This case is about the failure of the fiduciaries of the Plan, to protect the interests of Plan participants in violation of their legal obligations under ERISA.  Defendants (defined below) breached the duties they owed to the Plan by, *inter alia*, retaining SunEdison, Inc.'s ("SunEdison") common stock (hereafter, "SunEdison Stock") as an asset held by the Plan, when a reasonable fiduciary using the "care, skill, prudence, and diligence . . . that a prudent man acting in a like capacity and familiar with such matters" would have done otherwise.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

4.      Specifically, and as shown in greater detail below, Defendants permitted the Plan to continue to hold and/or offer SunEdison Stock as an investment option to Plan participants even after Defendants knew or should have known that during the Relevant Period — between July 20, 2015 and April 21, 2016 — that: (1) SunEdison was in extremely poor financial condition; and (2) SunEdison faced equally poor long-term prospects, making it an imprudent retirement investment for the Plan.  Defendants were empowered, as fiduciaries, to remove SunEdison Stock as an asset held by the Plan, yet they failed to do that, or to act in any way to protect the interests of the Plan or its participants, in violation of their legal obligations under ERISA.

5.      As set forth below, there were many red flags and warning signs that came to light during SunEdison's demise that Defendants could not have reasonably believed that SunEdison Stock was a prudent investment option.  As a result of Defendants' failure to recognize the imprudence of continued investment in SunEdison Stock, the Plan participants lost their hard-earned money.

6.      The market price of SunEdison Stock (symbol SUNE) fell from $31.66 on July 20, 2015 (the beginning of the Relevant Period) to $0.34 on April 21, 2016 (the end of the Relevant Period), as a result of SunEdison's filing for bankruptcy relief.  Thus, because bankruptcy filings

indicate that the SunEdison estate will not have sufficient funds to satisfy unsecured creditors, Plan participants holding SUNE stock in their Plan retirement accounts have effectively lost the entire value of their investment.

## JURISDICTION AND VENUE

7.      ***Subject Matter Jurisdiction.***  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.      ***Personal Jurisdiction.***  This Court has personal jurisdiction over all Defendants because they are all residents of the United States and ERISA provides for nation-wide service of process pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

9.      ***Venue.***  Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).  The Plan is administered in such District, some or all of the fiduciary breaches for which relief is sought occurred in such District, and one or more defendants reside or may be found in such District.

## PARTIES

**Plaintiff**

10.      ***Plaintiff Alexander Y. Usenko*** was an employee of SunEdison Semiconductor, LLC and a "participant" in the Plan during the Relevant Period, within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).   During the Relevant Period, Plaintiff Usenko held shares of SunEdison Stock through his individual Plan account, and suffered losses as a result of the Plan's investment of its assets in SunEdison Stock.  Specifically, during the Relevant Period, the value of SunEdison stock in Plaintiff Usenko's account diminished as a result of Defendants' breaches of fiduciary duty described herein.  Plaintiff Usenko is no different, in all material respects, than the many other SunEdison Semiconductor, LLC employees who entrusted the Defendant-fiduciaries with their retirement savings.

3

**Defendants**

11.     ***Defendant SunEdison Semiconductor, LLC ("Semiconductor")*** is a limited liability company headquartered at 501 Pearl Drive, St. Peters, Missouri.  Semiconductor is a fiduciary of the Plan and charged with the responsibility to appoint the other fiduciaries who sit on the Investment Committee of the SunEdison Semiconductor Retirement Savings Plan and Semiconductor is also charged with the responsibility to monitor the performance of said other fiduciaries.

12.     ***Defendant the Investment Committee of the SunEdison Semiconductor Retirement Savings Plan*** ("Investment Committee").  The Investment Committee is charged with the day-to-day management and administration of the Plan and/or management and disposition of the Plan's assets

13.     ***Defendants John Does 1-10*** were persons who had the duty and responsibility to properly appoint, monitor and inform the members of the Investment Committee and/or other persons who exercised day-to-day responsibility for the management and administration of the Plan and its assets.

## THE PLAN

**Purpose**

14.     Semiconductor was previously a wholly owned subsidiary of SunEdison, Inc., its former parent company.  Following an initial public offering of stock in SunEdison Semiconductor Limited (stock symbol SEMI), on May 28, 2014, the Plan was created.  A transfer of $86,252,289, representing all SunEdison, Inc. Retirement Savings Plan assets owned by former SunEdison employees who were now Semiconductor employees, was made from the SunEdison, Inc. Retirement Savings Plan to the Plan on June 24, 2014.

15.     The Plan is a defined contribution retirement savings plan, covering all eligible employees of Semiconductor.  The Plan is intended "to provide a means whereby an Employer may share its profits with its eligible Employees on a deferred basis and thereby provide a measure of financial support for such Employees and their Beneficiaries upon retirement or in the event of death or disability.  *See* SunEdison Semiconductor Retirement Savings Plan ("Semiconductor Plan Document"), Article I, Section 1.3.

16.     Pursuant to the Semiconductor Plan Document:

The Investment Committee may establish one or one Pooled Investment Funds, with different investment objectives, from time to time; and establish procedures consistent with the Plan permitting Participants to direct investment of all or a designated portion of their Individual Accounts among such Pooled Investment Funds.  The Investment Committee also may designate Segregated Investment Funds in which Participants may direct investment of all or a designated portion of their Individual Accounts.  In addition to options designated by the Investment Committee, there shall be a SunEdison Stock Fund.

Article XVIII, Section 18.1.

17.     Upon information and belief, the Investment Committee, as fiduciaries, are responsible for the day-to-day administration and operation of the Plan.

18.     Further, pursuant to the Plan's Financial Statements with Independent Auditor's Report, dated December 31, 2014, "[t]he SunEdison, Inc. Stock fund was frozen on February 1, 2015."  *Id.* at p. 8.

### SUNEDISON STOCK FUND

19.     The Plan held SunEdison Stock (symbol SUNE) valued at $5,725,906.

### CLASS ACTION ALLEGATIONS IN THE ALTERNATIVE

20.     Plaintiff brings this action derivatively pursuant to § 502(a)(2) and (3) of ERISA, 29 U.S.C. § 1132(a)(2) and (3).  Plaintiff brings this action derivatively on the Plan's behalf pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, and, in the alternative, as a class

action pursuant to Rules 23(a), (b)(1), and/or (b)(2) of the Federal Rules of Civil Procedure on

behalf of the Plan, Plaintiff, and the following class of similarly situated persons (the "Class"):

> All persons, except Defendants and their immediate family members, who were
> participants in or beneficiaries of the SunEdison Semiconductor Ltd. Retirement
> Savings Plan at any time between July 20, 2015 and April 21, 2016 (the "Relevant
> Period") and whose Plan accounts included investments in SunEdison Stock.

21. Plaintiff reserves his right to modify the Relevant Period definition in the event that

further investigation/discovery reveals a more appropriate and/or broader time period during which

SunEdison Stock constituted an imprudent investment option for the Plan.

22. Given ERISA's distinctive representative capacity and remedial provisions, courts

have observed that ERISA litigation of this nature presents a paradigmatic example of a FED. R.

CIV. P. 23(b)(1) class action.

23. The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and

can only be ascertained through appropriate discovery, Plaintiff believes there are thousands  of

employees of Semiconductor who participated in, or were beneficiaries of, the Plan during the

Relevant Period whose Plan accounts included SunEdison Stock.

24. At least one common question of law or fact exists as to Plaintiff and all members

of the Class.  Indeed, multiple questions of law and fact common to the Class exist, including, but

not limited to:

- whether Defendants each owed a fiduciary duty to the Plan, Plaintiff, and members

of the Class;

- whether Defendants breached their fiduciary duties to the Plan, Plaintiff, and

members of the Class by failing to act prudently and solely in the interests of the Plan and the

Plan's participants and beneficiaries;

- whether Defendants violated ERISA; and

- whether the Plan, Plaintiff, and members of the Class have sustained damages and, if so, what is the proper measure of damages.

25.     Plaintiff's claims are typical of the claims of the members of the Class because the Plan, Plaintiff, and the other members of the Class each sustained damages arising out of Defendants' wrongful conduct in violation of ERISA as complained of herein.

26.     Plaintiff will fairly and adequately protect the interests of the Plan and members of the Class because they have no interests antagonistic to or in conflict with those of the Plan or the Class.  In addition, Plaintiff have retained counsel competent and experienced in class action litigation, complex litigation, and ERISA litigation.

27.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the action, or substantially impair or impede their ability to protect their interests.

28.     Class action status is also warranted under the other subsections of Rule 23(b)(1)(A) and (b)(2) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; and (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

### FACTS BEARING UPON DEFENDANTS' FIDUCIARY BREACHES

**SunEdison Stock Was an Imprudent Investment for the Plan During
the Relevant Period Due to SunEdison's Changed Circumstances**

29.     Prior to and during the Relevant Period, SunEdison incurred a gargantuan amount of debt to fund its operations.  In particular, SunEdison's debt load reached $11.7 billion by the end of the third quarter of 2015 in part due to acquisitions of other entities.  This debt threatened SunEdison's liquidity and its ability to stay solvent.

30.     In 2014 and 2015, SunEdison spun off two separate entities, TerraForm Power, Inc. ("TERP") and TerraForm Global ("Global"), called "yieldcos."  Similar to real estate investment trusts ("REITS"), yieldcos are separate publicly traded companies that are formed to own and hold operating assets that produce a predictable cash flow and issue steady dividends to investors.

31.     Due to the chilled investor demand for Global's stock, SunEdison agreed to acquire $30 million of Global's Class A common stock in its IPO, which was expected to be purchased by public investors.

32.     In the spring of 2015, SunEdison took on massive debt consisting of $337 million in 3.75% Guaranteed Exchangeable Senior Secured Notes due 2020 (the "Exchangeable Notes") and a $410 million two-year loan (the "Margin Loan") in order to fund new acquisitions.

33.     As early as mid-2015, global markets turned against SunEdison and its growth strategy.  And, as recognized by analysts reports (including May 19, 2015 Avondale Partners article and an August 31, 2015 J.P. Morgan North American Equity Research article), investor demand for energy stock was weak —with an increasingly negative shift in attitudes toward yieldcos.

34.     SunEdison's overall corporate debt rose from $7.2 billion at the end of 2014 to $10.7 billion by the end of the second quarter of 2015.

35.     Rather than address known needs to increase revenues, lower debt, and service existing debt, SunEdison again jumped into another acquisition.  On July 20, 2015, SunEdison

announced in a press release that it had entered into a merger agreement with Vivint Solar, Inc. ("Vivint" or "VSLR"), a provider of residential solar systems in the United States, for $2.2 billion in cash, stock and convertible notes (the "Vivint Solar Acquisition").

36.     The liquidity risks facing SunEdison were widely reported to the public during the Relevant Period and were known or should have been well known to Defendant-fiduciaries, who nonetheless failed to investigate the continued prudence of investing Plan assets in SunEdison Stock and failed to act to protect the Plan participants' assets invested in SunEdison Stock.

37.     By the time of the Vivint Solar Acquisition, SunEdison was already highly leveraged and in financial distress as evidenced by its public quarterly reports discussed herein. As such, SunEdison needed TERP'S liquidity and credit resources to help finance the Vivint Solar Acquisition.  Consequently, SunEdison used its control over TERP (SunEdison retained over 90% of the voting power in TERP Power after its IPO) to compel TERP to purchase the assets that SunEdison was acquiring as part of its acquisition of Vivint.

38.     The market's negative reaction to the Vivint Solar Acquisition drove down SunEdison's Stock price from $31.56 on the trading day (July 17, 2015) before the announcement of the Vivint Solar Acquisition compared to $26.01 per share by the end of the following week.

39.     On August 6, 2015, SunEdison issued a press release, filed with the SEC as an exhibit to the Form 8-K, reporting results of its operations for the 2015 second quarter.  The results were dismal and should have alerted Defendant-fiduciaries (among other warning signs alleged herein that were already out in the public domain) of the need to investigate the prudence of maintaining the SunEdison Stock Fund as a Plan Investment.  In particular, SunEdison reported a loss of $263 million in its second quarter.  Additionally, SunEdison stated it had a loss of 93 cents

per share.  SunEdison also reported that gross margins on the projects that it had sold to TERP

were only 12.5% (down from SunEdison's prior guidance of 18%).

40.     The market reacted poorly to SunEdison's announcement of its 2015 second quarter

earnings:

> NEW YORK (TheStreet) -- SunEdison (SUNE - Get Report) shares are down by 12.90% to $19.92 in early market trading on Thursday, following the release of the solar energy company's 2015 second quarter earnings results.
>
> The company reported a net loss of $263 million, or a loss of 93 cents per share on an adjusted basis on revenue that rose 5.6% to $455 million for the quarter.
>
> *        *        *
>
> Separately, TheStreet Ratings team rates SUNEDISON INC as a Sell with a ratings score of D+.  TheStreet Ratings Team has this to say about their recommendation:
>
> "***We rate SUNEDISON INC (SUNE) a SELL.  This is driven by a number of negative factors, which we believe should have a greater impact than any strengths, and could make it more difficult for investors to achieve positive results compared to most of the stocks we cover.   The company's weaknesses can be seen in multiple areas, such as its generally high debt management risk and weak operating cash flow***."

*See* "SunEdison (SUNE) Stock Falling Following Earnings Results," *The Street*, Aug. 6, 2015

(emphasis added).  SunEdison Stock closed at $17.08 on August 6, 2015.

41.     On the same day that SunEdison released its 2015 second quarter earnings, alarms

rang in the financial press that instead of building a successful renewable energy conglomerate,

SunEdison was actually building nothing more than a "house of cards":

> Debt could be too much for this renewable energy giant to overcome.
>
> In a quarter when its competitors wowed investors with better than expected profits, SunEdison (NYSE: SUNE) is plunging after another massive quarterly loss.
>
> ***The loss itself shouldn't surprise anyone who follows SunEdison, but it highlights how tough it's going to be to build a renewable energy powerhouse with nearly $11 billion in debt and negative cash flow from operations. The market is finally starting to realize that this high-profile renewable energy powerhouse may actually be building a house of cards.***

**Constructing a renewable energy giant**

*What SunEdison has sold to investors over the past few years is that it can build a massive renewable energy company that can play in nearly every end market in every geography around the world.*  The company has built an 8.1 GW pipeline of projects with 1.9 GW under construction on top of 404 MW finished in the second quarter. Those are impressive numbers no matter who is building them.

*But building that scale has been costly for SunEdison. The company has a $10.7 billion debt load and continual losses quarter after quarter.*  Case in point was a loss of $263 million in the second quarter of 2015 on $455 million of revenue.

*There are a few alarming numbers in last quarter's report besides the loss.*  First is that marketing and administration costs were $259 million, more than two and a half times the $103 million gross margin the company generated.  On top of that, interest expense was $146 million, again more than gross margin.

*With losses mounting and debt piling up, the only way for SunEdison to get out from under the pressure is to build more projects even faster with even more debt.* It's the only path to potential profitability, but it's fraught with risk if interest rates rise or competitors with better technology begin winning projects.  Given First Solar and SunPower's profitable results over the last two weeks, I think that second concern is bigger than SunEdison wants to admit.

**TerraForm Power paying money it doesn't have.**

*You could say that SunEdison is just pushing projects down to its yieldco, TerraForm Power* (NASDAQ: TERP), which will monetize projects long term. *That's true, and it has grown cash available for distribution (CAFD), but again, it's starting to look like a house of cards.*

TerraForm Power's CAFD for Q2 was reported to be $65 million, and it paid a dividend of $0.335 per share.  But cash provided by operations was just $45.9 million, and net income was just $29.1 million.  On top of that, the company has $2.3 billion of debt to pay for with the cash flow.

At the very least, TerraForm Power is being aggressive about what it pays to shareholders and SunEdison, who owns all of its incentive distribution rights, and it is willing to leverage the balance sheet to do that.

**Beware buying the biggest in renewable energy**

*SunEdison likes to tout itself as the biggest company in renewable energy, but it's far from the most profitable, despite having one of the biggest debt loads in the industry.*  That concerns me as an investor, and I don't see any sort of

sustainable advantage for the company in renewable energy right now. SunEdison uses commodity solar panels, wind turbines manufactured by large conglomerates, and even battery storage that's a commodity.

*I'm not sure that's a path to success in renewable energy, and nearly $11 billion in debt is enough to scare me far away from this stock.*

*See* "SunEdison's Losses Become a Red Flag for Investors," *The Motley Fool*, Aug. 6, 2015 (emphasis added).

42.     The massive losses reported by SunEdison for its second 2015 quarter, the significant SunEdison Stock price decline, as well as media reports that SunEdison was based on nothing but a "house of cards" because of SunEdison's massive debt load and weak operating cash flow, among other problems, should have prompted Defendants to investigate the continued prudence of holding this asset in the Plan and to have concluded that protective action to dispose of the Plan's investment in SunEdison Stock was necessary.  Had a proper investigation been conducted, a prudent fiduciary would have determined that SunEdison Stock was no longer a prudent retirement investment for the Plan's participants.  However, Defendants did no reasonable investigation and instead continued to hold and/or offer the SunEdison Stock Fund as a Plan investment option, in derogation of their ERISA duties.

43.     At the same time, investor demand for energy stocks was unexpectedly weak, with many energy investors (particularly hedge funds) retrenching in light of the combined collapses of the oil and equities markets and an increasingly negative shift in attitudes towards yieldcos.  *See* J.P. Morgan, North America Equity Research, *SunEdison, Inc.—In Light of Current Events: Initiating at Overweight*, at 4 (Aug. 31, 2015).  In fact, the stock price of a SunEdison competitor's yieldco — NRG Yield Inc. — plunged nearly 70% between June and October 2015.  *See* Keith Goldberg, *Yieldco Bubble Set To Pop For Clean Energy Cos.*, Law360 (Oct. 8, 2015).

44.     On November 10, 2015, SunEdison issued a press release, filed with the SEC as an exhibit to the Form 8-K, reporting results of its operations for the third quarter ended September 30, 2015.  Like the second quarter results, these results were also nothing but dismal.  SunEdison incurred a loss of 92 cents per share from continuing operations for the third-quarter 2015, much wider than the year-ago quarter loss of 77 cents.  SunEdison's general and administration expenses increased about 135% to $296 million.  Moreover, interest expenses doubled to $214 million because of higher debt.  Therefore, SunEdison posted a loss from continuing operations of $287 million or 92 cents per share compared with a loss of $204 million or 77 cents posted in the third quarter of 2014.

45.     On the same day, SunEdison released its third quarter 2015 results, *Reuters* reported that:

> Nov 10 (*Reuters*) -- Shares of SunEdison Inc slid 24 percent to a nearly two-and-a-half-year low on Tuesday after the U.S. solar company posted a wider-than-expected loss, ***raising fresh concerns about its ability to fund its operations, projects and acquisitions***.
>
> The stock was down $1.49, or 20.1 percent, at $5.91 in midday trade on the New York Stock Exchange.  The stock has lost 82 percent of its value since hitting a year high of $33.44 on July 20.
>
> The company also said it would stop selling projects to its two "yieldcos" -- bundles of solar, wind or other power assets it spun off into dividend-paying public entities.
>
> The yieldcos had become an important source of funding for SunEdison.  The solar industry bellwether said in its quarterly report on Monday that there were no assurances it would be able to raise the $6.5 billion to $8.8 billion needed to fund the construction of renewable energy assets through 2016. […]

*See* "SunEdison shares slide 24 percent on liquidity fears," *Reuters*, Nov. 10, 2015 (emphasis added).

46.     The following day, on November 11, 2015, *Business Insider* reported that:

Renewable-energy firm SunEdison is down 14% after the company disclosed a number of cash commitments in its quarterly earnings report.

Here are the details:

- According to an agreement SunEdison made in September, it has bought $100 million worth of TerraForm Global stock from one of its partners, Renova, in March 2016.  TerraForm Global is down 4.2%.

- It also may have to buy $4 billion worth of wind-farm projects from Renova.

- Meanwhile, another SunEdison affiliate, TerraForm Power, could be required to buy 450 megawatts of completed Vivint projects in 2016, and up to 500 megawatts per year from 2017 to 2020 from SunEdison.

- TerraForm Power is also obligated to pay $580.3 million of assets for some residential projects.  TerraForm Power is down 4.3%.

That's a lot of cash.

SunEdison has been hurting some of Wall Street's biggest names since the stock price started falling this summer.  The stock is down 75% year-to-date.

David Einhorn of Greenlight Capital, and Leon Cooperman of Omega Advisors, have taken a hit.  In August, Cooperman asked SunEdison executives if they would buy back some stock to stop the bleeding.

He said: "Is there a massive change in the absolute relative prices of a number of your entities you're involved with?   Does this create an opportunity for you creating additional value for shareholders by capitalizing on the short-term pessimism in midterm market or is that financial resource pretty much earmarked for reinvestment in the business?"

In plain English, Cooperman was hoping that the company might embark on stock buybacks.  The answer was "no" then, and given these disclosures regarding the company's hefty cash commitments, it's probably "no" now, too.

*See* "SunEdison is getting obliterated," *Business Insider*, Nov. 11, 2015.

47.    In the meantime, despite the additional red flags raised by the third quarter 2015

results regarding SunEdison's business and prospects and the negative commentaries in the

14

financial press, Defendant-fiduciaries continued to hold the SunEdison Stock Fund as a Plan investment asset, made no reasonable investigation of the prudence of continued investment of Plan assets in SunEdison Stock and took no protective action with regard to the Plan's assets invested in SunEdison Stock.

48.     On November 19, 2015, following the release of SunEdison's financial results for the third quarter of 2015, *Real Money* reported that:

> How did the former darling of the S&P 500 sink so low?  It seems the company cannot catch a break, as liquidity concerns have caught the attention [of] Wall Street analysts as well as hedge funds, who pared down their position in the company. The Missouri-based renewable energy company develops, builds and operates solar and wind power plants.   As part of its business, the company spun off two companies – TerraForm Global (GLBL) and TerraForm Power (TERP), both YieldCos – to operate its projects.  ***As of Wednesday's market close, its stock price has fallen 83% this year to $3.25 from $19.74***.

> "***The company overextended itself, continuing to make big acquisitions even when it became clear that the market had turned against them***," Jim Cramer said of the company in August as the stock was already in freefall.

> Recent news hasn't been much better for SunEdison.  The company's disappointing third-quarter earnings, released on November 10, raised questions about its ability to meet current obligations.

> The reality is this:  ***SunEdison's debt went from $2.6 billion to $11.7 billion currently***," Gordon Johnson of Axiom Capital Management told Real Money.  "A lot of that debt was due to the purchase of companies and projects they intended to drop down to the YieldCo.  They can no longer do that so the question is can they sell that stuff into the open market at accretive margins?"

> The company's current ratio, which measures current assets vs. current liabilities, stands at 1.3, below the 1.5 to 2.0 range considered prudent by stock analysts.

> Axiom also takes issue with the company meeting its targets and how it measures – and discloses – its margins.  In October, SunEdison said it planned to sell projects at 18% to 19% gross margin, but it reported that the projects were actually sold at 15%.  Making matters worse, SunEdison said that the project excluded equipment, according to James Bardowski of Axiom.

> "When you include the full solar system, they actually sold it at 9.6% gross margin – far below what they told everyone a month prior," Bardowski told Real Money.

15

Also concerning analysts is a $160 million loan SunEdison received from Goldman Sachs.  Axiom as well as other analysts believe the loan was used to pay off another loan from Deutsche Bank.  The company stated an interest rate on the loan of 9.25%, but paid a hefty origination fee, which made the effective rate closer to 15% — a high rate for short-term financing.

"There's an absence of transparency in their financials," said Doug Kass, of Seabreeze Partners Management and columnist for Real Money Pro.  In reference to the company's sales figures as well as the Goldman Sachs loan.

While fundamental issues about the company's sustainability persist, SunEdison has also taken several other hits this week.  On Monday, as hedge funds submitted their 13Fs, it was revealed that several, including David Einhorn's Greenlight Capital and Dan Loeb's Third Point, significantly pared down or completely exited their positions in SunEdison during the third quarter.  Share of stock plummeted 33% on Tuesday, in response to the news.

*See* "Will Troubled SunEdison Need to Raise More Equity?," *Real Money*, Nov. 19, 2015

(emphasis added).

49.  *Barron's* also echoed the analysts' concerns regarding SunEdison's liquidity, as well as analyst downgrades of SunEdison Stock:

UBS dropped its price target to $3 a share from $6 on Wednesday.  Analyst Julien Dumoulin-Smith explained:

We value SUNE on a SOTP [sum of the parts] basis using a combination of EV/EBITDA and DCF [distributable cash flow' approaches plus the market value of LP ownership stakes in TERP and GLBL.  We no longer assign any credit for GP incentive distribution rights (~$2/sh previously) and we now subtract the value of -$169M of expensive (9.25%) term loans taken out in August as disclosed in the most recent 10Q (another $0.50).  We've decreased Vivint Solar (VSLR)'s cash balance from ~$150 mn to $82 mn per the earnings update.  It remains unclear the new sale price for the VSLR assets to TERP via SUNE (who is responsible for pricing this sale, presumably driving further downgrade if unable to receive relief on VSLR terms).

***SUNE shares have been sliding this month following third quarter results that raised questions about its liquidity and ability to afford all its recent acquisitions. Reports that hedge funds were unloading their holdings in the third quarter and that management was not providing answers to analysts' questions have made matters worse.***

*See* "SunEdison Closes Below $3 A Share," *Barron's*, Nov. 19, 2015 (emphasis added).

50.     SunEdison's Stock plunged by 83% during the second half of 2015, as investors became increasingly concerned about SunEdison's ability to finance its plans, according to *Bloomberg*.   In addition to the enormous decline of its stock price, SunEdison continued to experience other serious financial difficulties during the fall of 2015, including a dearth of liquidity, falling margins, and a reclassification of $739 million of its debt from "non-recourse" to "recourse."     However, throughout this time, despite the red flags concerning, *inter alia*, SunEdison's extraordinary debt and market fears it would not be able to survive, raised by both SunEdison's own quarterly reports, as well as the financial press covering SunEdison, Defendant-fiduciaries did nothing to investigate the continued prudence of SunEdison Stock as an investment for retirement nor to protect the Plan participants' assets invested in SunEdison Stock.

51.     SunEdison's struggles continued in 2016.   On January 7, 2016, SunEdison filed Form 8-K with the SEC, announcing pricing of $725 million of second lien secured term loans and entry into a series of exchange agreements, through which SunEdison swapped its debt for a mix of equity and new debt with a higher interest payment than the old debt did, resulting in $738 million debt restructuring.   However, SunEdison's desperate move to restructure its debt in an effort to stay afloat did not succeed in propping up the SunEdison Stock price, which already had been declining for months during the preceding year (which went ignored by the Plan's fiduciaries).   The same date of the debt restructuring announcement, it was publicly reported that:

> Shares of the solar power semiconductor manufacturer are down over 40% following a series of complex moves that the company made to reduce debt.
>
> First of all, SunEdison is offering a new $725 million second lien loan that will be used to pay about $170 million on a second lien credit.   Included in this loan are 28.7 million shares worth of warrants.

Also, $580 million worth of notes will be traded for a $225 million note due in 2018, plus 28 million common shares. Finally, 11.8 million common shares are being traded for $158.3 million in preferred stock.

This has triggered today's massive sell-off because how dilutive it is for investors. Unfortunately, diluting the stock seems like a necessary evil for SunEdison, which desperately needs to reduce its debt. However, no one was expecting the costs to be this high.

*See* "Why Is SunEdison Stock Crashing?" *Zacks Equity Research*, Jan. 7, 2016.

52. SunEdison's January 7, 2016 announcement that it was restructuring its debt did not stave off the analysts' concerns about SunEdison's ability to survive. On the contrary, more alarms concerning, *inter alia*, SunEdison's massive debt, liquidity risks, and ability to raise more funds for project financing continued to sound in the financial press:

**Highlights of Debt Restructuring**

SunEdison revealed that it is offering a $725 million second lien loan comprising of $500 million of A1 loans and $225 million of A2 loans. Both the loans, to mature on Jul 2, 2018, carry an interest rate of LIBOR+10%. The loan also includes 28.7 million shares worth of warrants.

This loan is part of its series of exchange agreements with certain holders of its Convertible Senior Notes due 2018, 2020, 2022 and 2025 and Perpetual Convertible Preferred Stock (the "2018 Notes," "2020 Notes," "2022 Notes," "2025 Notes," and "Preferred Stock," respectively).

The company intends to use part of the net proceeds to repay the existing $170 million second lien credit. The remaining will be utilized for the payment of interests, transaction costs and general corporate purposes.

Also, $580 million worth of notes will be traded for a $225 million note due in 2018, plus 28 million common shares. Finally, 11.8 million common shares will be traded for $158.3 million in preferred stock.

**What Triggered the Sell-off?**

According to *Bloomberg*, though the aforementioned deals will increase SunEdison's net debt position by $42 million, it will add $555 million to liquidity — a very positive strategy for a cash-strapped company.

Then what made investors sell the stock?  The high cost SunEdison is incurring to enhance liquidity.

Citing Sven Eenmaa, an analyst at Stifel Financial Corp., *Bloomberg* revealed that the new transaction will increase SunEdison's annual interest expenses by about $40 million. The financial data provider also stated that this will dilute existing shareholders by approximately 18%.

**Conclusion**

***It is to be noted that SunEdison has been struggling to finance its projects due to the tremendous debt burden it incurred because of the string of buyouts, including First Wind and Solar Grid Storage, made over the past one year.***

The situation worsened in July last year when SunEdison entered into a definitive agreement to acquire Vivint Solar Inc. VSLR in a cash-stock deal worth $2.2 billion. The deal made investors increasingly cautious about its rising debt pressure.

These acquisitions, once believed to be strategic, are now burning a hole in SunEdison's pocket. The acquisitions have taken a toll on its balance sheet with total outstanding debt (including current portion) nearly doubling to $11.7 billion at the end of third-quarter 2015 from $6.3 billion a year ago.

***Although SunEdison has taken a series of initiatives***, such as lowering its offer price for the Vivint Solar buyout and quitting the development projects in Brazil, to improve the liquidity position, ***we don't see any material impact on its balance sheet.***

***Further, we believe that with the recent sell-off, it will become difficult for SunEdison to raise more funds for project financing. Therefore, as the going gets tough for the company, we would advise investors to stay away from this Zacks Rank #3 (Hold) stock for now.***

*See* "SunEdison Dives 39% on Complex Debt Restructuring Moves," *Zacks Equity Research*, Jan. 8, 2016 (emphasis added).

53.    Following SunEdison's January 7, 2016 debt restructuring announcement, it was widely reported in the financial press that SunEdison's financial prospects (and therefore the value of SunEdison Stock, and the corresponding value of the Plan's assets invested in this asset) continued to look grim:

*A move to reduce debt may tell us more about how much trouble SunEdison Inc. is in than anything else*.

On the surface, you wouldn't think a financial swap that reduces both long- and short-term debt would be a bad thing for a highly indebted company. But *for SunEdison Inc (NYSE: SUNE), the announcement that it was swapping debt for equity and a reduced amount of debt was met with scorn on Wall Street*. …

The problem for SunEdison is that it got so indebted that creditors started demanding higher and higher interest rates.  At the same time, the company was forced to pivot strategies to selling projects to third parties, which is lower margin than holding them on the balance sheet.  *The combination of higher borrowing costs and lower margins may be too much for SunEdison to overcome*.

**The thing with debt...**

\*      \*      \*

The problems with debt start to show if returns don't exceed the cost of debt. And *with $11.7 billion in debt, $7.9 billion of which is at the parent company, the cost of debt is high for SunEdison*.

\*      \*      \*

According to analyst Sven Eenmaa at Stifel Financial Corp., the exchange offer made on Thursday will actually increase interest expense annually by about $40 million because it exchanged low interest rate convertible debt for higher interest rate term debt. With this included, SunEdison's interest costs are about $276 million per year.

\*      \*      \*

Just breaking even will be a challenge based on the numbers above, but it's possible with an expected 3.5 GW installed in 2016. The real problems start to emerge when you start looking at its future cost of debt.

. . . the $725 million term loans announced yesterday came with interest rates of LIBOR + 10%, or about 10.85% as of today at 6-month LIBOR rates.

*That's an insanely high interest rate compared to competitors* like First Solar and SunPower, who are paying LIBOR plus 3.5% or less on short-term debt.  *Not only does that mean interest costs may be increasing further in the future, it make it harder for SunEdison to build projects with competitive financing structures versus competitors.*

\*      \*      \*

20

The general theme here is that ***SunEdison's business is moving toward the lower-margin business of selling projects to third parties at the same time its borrowing costs are trending higher.  That's a slippery slope for any business, and it doesn't bode well for SunEdison, especially when it's competing against companies with much lower cost structures.***

As an investor, I'm staying far away from a high-risk company like SunEdison. It's possible the company survives all of these challenges, but ***the path it's currently on is unsustainable***, and I think there's a lot more dilution and/or restructuring to be done before it gets out from under its messy financial situation.

***The history of highly indebted companies in renewable energy isn't good, and the path forward for SunEdison doesn't look like a profitable one for investors.***

"SunEdison Inc's Digging a Hole It May Never Get Out Of", *The Motley Fool*, Jan. 9, 2016 (emphasis added).

54.    Indeed, because the market did not react positively to SunEdison's debt restructuring maneuver announced on January 7, 2016, the value of the Plan's assets invested in SunEdison Stock continued to decline, reflecting the severe deterioration of SunEdison's financial performance:

…*24/7 Wall St.* has tracked five companies in which shareholders were destroyed last week.

\*    \*    \*

***Investors pummeled SunEdison Inc. (NYSE: SUNE) after it restructured more of its debt this week, sending the share price down 46% at one point***.  The restructuring deal extinguishes about $580 million in convertible debt and $158.3 million in preferred stock.  The so-called Second Lien Secured Term Loans are expected to close on January 11, and SunEdison expects to receive $725 million in cash. After paying off approximately $170 million on its existing second lien credit facility, SunEdison will retain $555 million for, among other things, general corporate purposes.

The transactions will dress up the company's balance sheet, but the price is very high, according to one analyst cited by *Bloomberg*.  SunEdison's interest expense is likely to grow by $40 million a year and existing shareholders are being slapped with about 18% dilution to the value of their shares.  Over the past week, the stock

dropped roughly 30%. Shares of SunEdison closed at $3.41 late on Friday, with a consensus price target of $14.93 and a 52-week range of $2.55 to $33.45.

*See* "5 Stocks That Destroyed Shareholders This Past Week," *24/7 Wall St.com*, Jan. 9, 2016

(emphasis added).

55.     On January 12, 2016, as SunEdison Stock continued on its downward slide, it was

reported that:

> **Gordon Johnson has doubts about SunEdison Inc (NYSE: SUNE)'s chances of making it through the year**.
>
> Speaking Tuesday on PreMarket Prep, Johnson said he's concerned by the company's debt.
>
> "SunEdison amassed a massive amount of debt . . . .  The majority of that debt was used to buy projects they intended to drop down into their yieldco," Johnson said, noting that SunEdison took on $10 billion in new debt from 2011-2015. "Essentially what happened is the yieldco story ended, and this was a company left with a lot of debt and a lot of projects which are extremely capital intensive. When the yieldco story fell apart, you didn't have that buyer of first resort."
>
> The stock, which traded as high as $33.45 in July, was trading around $3 on Tuesday morning.  The stock was briefly halted on a circuit breaker.
>
> The question now, according to Johnson, is whether SunEdison can sell these projects in the third-party merchant market.  It's been trying since the second quarter of 2015, yet so far haven't been able to sell outside its own warehouses and yieldcos.
>
> This is the core of Johnson's worry: "Given the number of deals and the type of deals that they've done . . . if they're unable to sell those projects, *I don't know how much longer the equity can last*."
>
> **When asked if SunEdison's new financing deal was a good move, Johnson responded, "Absolutely not. I think this deal makes me more cautious on the company's ability to make it through 2016. . . ."**

*See* "Axiom's Gordon Johnson 'More Cautious' On SunEdison's Ability To Make It Through

2016," *Benzinga.com*, Jan. 12, 2016 (emphasis added).

56.     On January 12, 2016 alone, SunEdison Stock plummeted by 29% in mid-day trading, and closed down 9.6 % further undermining SunEdison's ability to survive:

> ***More concerns about high debt costs are hitting SunEdison and calling its future into question***.
>
> **What**: Shares of SunEdison Inc (NYSE: SUNE) fell as much as 29% mid-day on Wall Street Tuesday after another analyst questioned the company's long-term survival.
>
> **So what**: Analyst Gordon Johnson at Axiom Capital Management raised more concerns about the company's recent debt restructuring.  Details of that restructuring can be seen here, but the short story is that SunEdison traded debt for a combination of equity and new debt that actually holds a higher interest payment than the old debt.
>
> What's concerning is that the restructuring came with debt that holds an interest rate in excess of 10%, incredibly high considering the fact that SunEdison bid aggressively to win projects on the idea that it had a low cost of capital. Johnson said on a podcast this morning, "***I don't know how much longer the equity can last***."
>
> **Now what**: ***SunEdison has been in a downward spiral and it's a situation that will be almost impossible to get out of at this point.***  The company needs low cost funding to build projects and needs new projects to pay for debt already on the balance sheet. With both working against the company there's not a likely scenario where it can get enough funding to dig out of its current hole.  ***For investors, the risk of bankruptcy sometime in the next year is too big to ignore and I see no reason to buy the stock now***.

*See* "Why SunEdison Inc's Shares Dropped Another 29% Today," *The Motley Fool*, Jan. 12, 2016 (emphasis added).

57.     SunEdison Stock hit a new 52-week trading low of $2.36 on January 12, 2016, closing at $3.02.  Summing up the serious issues plaguing SunEdison, one financial publication reported as follows:

> . . . Separately, recently, *TheStreet Ratings* objectively rated this stock according to its "risk-adjusted" total return prospect over a 12-month investment horizon. . . . *TheStreet Ratings* has this to say about the recommendation:

*We rate SUNEDISON INC as a Sell with a ratings score of D*.  This is driven by a few notable weaknesses, which we believe should have a greater impact than any strengths, and could make it more difficult for investors to achieve positive results compared to most of the stocks we cover.  *The company's weaknesses can be seen in multiple areas, such as its generally high debt management risk, generally disappointing historical performance in the stock itself and feeble growth in its earnings per share*.

Highlights from the analysis by *TheStreet Ratings Team* goes as follows:

*The debt-to-equity ratio is very high at 8.33 and currently higher than the industry average*, implying increased risk associated with the management of debt levels within the company.  *Along with the unfavorable debt-to-equity ratio, SUNE maintains a poor quick ratio of 0.76*, which illustrates the inability to avoid short-term cash problems.

*Looking at the price performance of SUNE's shares over the past 12 months, there is not much good news to report: the stock is down 82.14%, and it has underperformed the S&P 500 Index.  In addition, the company's earnings per share are lower today than the year-earlier quarter.*  Naturally, the overall market trend is bound to be a significant factor. However, in one sense, the stock's sharp decline last year is a positive for future investors, making it cheaper (in proportion to its earnings over the past year) than most other stocks in its industry. But due to other concerns, we feel the stock is still not a good buy right now.

*SUNEDISON INC's earnings per share declined by 19.5% in the most recent quarter compared to the same quarter a year ago*. *The company has reported a trend of declining earnings per share over the past two years* . . . .

*See* "Here's Why SunEdison (SUNE) Stock Is Plummeting Today," *The Street*, Jan. 12, 2016 (emphasis added).

58.    On February 29, 2016, SunEdison admitted that its Audit Committee had been conducting an internal investigation since November 2015 or earlier when it filed with the SEC a Form NT 10- K reporting that it would delay filing of its Form 10-K Annual Report.  SunEdison cited the activity of its Audit Committee as the reason for the delay, identifying "the need to complete all steps and tasks necessary to finalize SunEdison's annual financial statements" as well as "ongoing inquiries and investigations by the Audit Committee."

59.     In March 2016, SunEdison announced that the filing of its Annual Report on Form 10-K for the year ended December 31, 2015 with the SEC would be delayed beyond the extended due date of March 15, 2016.   The scope of work required to finalize SunEdison's financial statements included in the 2015 Annual Report on Form 10-K expanded due to the identification by management of material weaknesses in its internal controls over financial reporting, primarily resulting from deficient information technology controls in connection with newly implemented systems.   Because of these material weaknesses, additional procedures are necessary for management to complete SunEdison's annual financial statements and related disclosures, and for SunEdison's independent registered accounting firm, KPMG LLP, to finalize its audits of SunEdison's annual financial statements and the effectiveness of internal controls over financial reporting as of December 31, 2015.  In addition, an investigation by SunEdison's Audit Committee concerning the accuracy of its anticipated financial position previously disclosed to SunEdison's Board was not finalized until April 2016.

60.     In March 2016, SunEdison received a subpoena from the U.S. Department of Justice (the "DOJ") seeking information and documentation relating to: (a) certain financing activities in connection with SunEdison's acquisition of Vivint, (b) the conduct of a former non-executive employee who is alleged to have committed wrongdoing in connection with the Vivint termination negotiations, (c) the previously disclosed investigations by SunEdison's Audit Committee, (d) intercompany transactions involving SunEdison and each of TERP and Global and (e) the financing of SunEdison's Uruguay projects in connection with project costs and equity contributions that remain to be contributed by SunEdison and the DOJ may have additional requests.

61.     In April 2016, SunEdison and certain of its subsidiaries filed a voluntary petition for relief (the "Bankruptcy Petition") under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") under the caption *In re SunEdison, Inc.*, Case No. 16-10992 (the "Bankruptcy Case"). SunEdison stated that it intended to continue to operate its business as a "debtor-in-possession" under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and the orders of the Bankruptcy Court.

62.     In April 2016, SunEdison received a delisting notification (the "Delisting Notice") from the staff of NYSE Regulation (the "Staff"). The Delisting Notice advised SunEdison that, following SunEdison's announcement that it and certain of its domestic and international subsidiaries had filed the Bankruptcy Petition under the Bankruptcy Code in the Bankruptcy Court, SunEdison's securities were subject to delisting from the New York Stock Exchange (the "NYSE"). The Delisting Notice noted that the common stock was suspended immediately from trading at the market opening on the NYSE on April 21, 2016.

63.     Accordingly, during the Relevant Period, SunEdison Stock was not a prudent investment option for the Plan participants, in light of, *inter alia*, (a) poor historical performance of SunEdison Stock; (c) massive amounts of debt threatening SunEdison's ability to finance its projects and thereby threatening SunEdison's survival; (d) SunEdison's rising debt-to-equity ratio; (e) SunEdison's likelihood of bankruptcy; (f) SunEdison's high debt management risk; and (g) SunEdison's continued financial losses as noted in its quarterly reports.

**DEFENDANTS HAD A CONTINUING DUTY TO MONITOR THE SUITABILITY OF SUNEDISON STOCK IN THE PLAN BUT FAILED TO DO SO**

64.     Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to

26

exercise prudence in selecting investments at the outset.  Here, the Defendants failed to monitor the assets held in the SunEdison Stock Fund and failed to remove this investment from the Plan as it was clearly an imprudent investment option for the reasons stated above and below:

65.     The price of SunEdison Stock collapsed by 100% during the Relevant Period.  The Plan's losses would have been avoided, in whole or in part, had Defendants complied with their ERISA fiduciary duties, including, but not limited to (a) investigating, evaluating, and deciding whether SunEdison Stock was a prudent retirement investment in light of SunEdison's severe liquidity problems from the start of the Relevant Period and (b) allowing for the orderly liquidation of the Plan's holdings of SunEdison Stock.

66.     The Plan suffered millions of dollars in losses because Defendants caused substantial assets of the Plan to be imprudently invested, or allowed participants to remain invested in SunEdison Stock during the Relevant Period, in breach of Defendants' fiduciary duties.  These losses were reflected in the diminished account balances of the Plan participants.

67.     Defendants failed to actively monitor and assess whether an investment of retirement savings in SunEdison Stock was prudent, in light of the deteriorating financial condition of SunEdison and severe liquidity problems which presented a material risk of complete loss to the SunEdison Stock Fund.  As a consequence of Defendants' actions and failure to act, Defendants are liable under ERISA for losses caused by the Plan's investment in the SunEdison Stock Fund when it was imprudent to make such investments.

**THE RELEVANT LAW:  CLAIMS FOR RELIEF UNDER ERISA**

68.     ERISA requires that every plan name one or more fiduciaries who have "authority to control and manage the operation and administration of the plan."  ERISA § 1102(a)(1). Additionally, under ERISA, any person or entity, other than the named fiduciary that in fact

27

performs fiduciary functions for the Plan is also considered a fiduciary of the Plan.  A person or

entity is considered a Plan fiduciary to the extent:

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

69.     At all relevant times, Defendants are/were and acted as fiduciaries within the

meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

70.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil

action may be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

71.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part, that:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

72.     ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B), provide, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest

of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants

and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances

then prevailing that a prudent man acting in a like capacity and familiar with such matters would

use in the conduct of an enterprise of a like character and with like aims.

73.     These fiduciary duties under ERISA § 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the highest known to the law and entail, among other things:

(a)     the duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan;

(b)     the duty to avoid conflicts of interest and to resolve them promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor;

(c)     the duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

74.     Accordingly, if the fiduciaries of a plan know, or if an adequate investigation would reveal, that an investment option is no longer a prudent investment for that plan, then the fiduciaries must disregard any plan direction to maintain investments in such stock and protect the plan by investing the plan assets in other, suitable, prudent investments.

75.     ERISA § 405(a), 29 U.S.C. § 1105 (a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

[I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

29

(C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

76.    Plaintiff therefore brings this action under the authority of ERISA § 502(a) for Plan-wide relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by Defendants for violations under ERISA § 404(a)(1) and ERISA § 405(a).

## REMEDIES FOR BREACHES OF FIDUCIARY DUTY

77.    As noted above, as a consequence of Defendants' breaches, the Plan suffered significant losses.

78.    ERISA § 502(a), 29 U.S.C. § 1132(a) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

79.    Plaintiff, the Plan, and the Plan participants are therefore entitled to relief from Defendants in the form of:  (1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a), 29 U.S.C. §§ 1109(a) and 1132(a); (3) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

80.    Each Defendant is jointly and severally liable for the acts of the other Defendants as a co-fiduciary.

30

## COUNT I

81.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

82.     This Count alleges fiduciary breaches against the Defendants for failing to do a proper investigation into, and failing to properly monitor, the continued prudence of investing Plan assets in SunEdison Stock and for continuing to allow the investment of the Plan's assets in SunEdison Stock throughout the Relevant Period despite the fact that they knew or should have known that such investment was imprudent as a retirement vehicle because SunEdison's investment risk profile had been so dramatically altered due to its failing business prospects that it was no longer a prudent retirement investment.

83.     At all relevant times, as alleged above, Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan and/or disposition of the Plan's assets and/or had a duty to properly appoint and monitor other fiduciaries.

84.     Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that all investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested. Defendants were responsible for ensuring that all investments in SunEdison Stock in the Plan were prudent.  Defendants are liable for losses incurred as a result of such investments being imprudent.

85.     Upon information and belief, Defendants failed to engage in a reasoned decision-making process regarding the prudence of SunEdison Stock.  An adequate investigation by Defendants would have revealed to Defendants that investment by the Plan in SunEdison Stock

was clearly imprudent during the Relevant Period and/or that other fiduciaries were not carrying out their duties with the requisite care.  A prudent fiduciary acting under similar circumstances would have acted to protect Plan participants against unnecessary losses, and would have made different investment decisions and/or different appointment and/or monitoring decisions.

86.    Defendants breached their duties to prudently manage the Plan's assets invested in SunEdison Stock.  During the Relevant Period, Defendants knew or should have known that, as described herein, SunEdison Stock was not a suitable and appropriate investment for the Plan. Yet, during the Relevant Period, despite their knowledge of the imprudence of the investment, Defendants failed to take any meaningful steps to protect Plan participants from losses stemming from the Plan's investment in SunEdison Stock.

87.    Defendants further breached their duty of prudence by failing to divest the Plan of SunEdison Stock during the Relevant Period when they knew or should have known that it was not a suitable and appropriate investment for the Plan.

88.    As a result of Defendants' knowledge of the financial health of SunEdison, any generalized warnings of market risks and/or diversification risks that Defendants made to the Plan participants regarding the Plan's investment in SunEdison Stock did not effectively inform the Plan participants of the past, immediate, and future dangers of investing in SunEdison Stock.

89.    Defendants also breached their co-fiduciary obligations by, among their other failures, knowingly participating in each other's failure to protect the Plan from inevitable losses. Defendants had or should have had knowledge of such breaches by other fiduciaries of the Plan, yet made no effort to remedy them.

90.    As a direct and proximate result of the breaches of fiduciary duties during the Relevant Period alleged herein, the Plan and, indirectly, the Plan participants lost a significant

portion of their retirement investments. Had Defendants taken appropriate steps to comply with their fiduciary obligations during the Relevant Period, the Plan could have liquidated some or all of its holdings in SunEdison Stock, and/or not have purchased additional imprudent SunEdison Stock, and thereby eliminated, or at least reduced, the losses to Plan participants.

91.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

<u>**REQUEST FOR RELIEF**</u>

**WHEREFORE**, Plaintiff requests the following relief:

A.     A Judgment that Defendants, and each of them, breached their ERISA fiduciary duties to the Plan participants during the Relevant Period;

B.     A Judgment compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets and from failure to properly monitor the performance of other fiduciaries and from failure to properly appoint other fiduciaries, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if Defendants had fulfilled their fiduciary obligations;

C.     A Judgment imposing a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.     A Judgment awarding actual damages in the amount of any losses the Plan suffered, to be allocated among the Plan participants' individual accounts in proportion to the accounts' losses;

E.      A Judgment requiring that Defendants allocate the Plan's recoveries to the accounts of all Plan participants who had any portion of their account balances invested in SunEdison Stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of SunEdison Stock;

F.      A Judgment awarding costs pursuant to 29 U.S.C. § 1132(g);

G.      A Judgment awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

H.      A Judgment awarding equitable restitution and other appropriate equitable monetary relief against Defendants.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 9, 2017

> **DYSART TAYLOR COTTER**
> **McMONIGLE & MONTEMORE, P.C.**
>
> By: */s/ Don R. Lolli*
>        Don R. Lolli               #56263MO
> 4420 Madison Avenue, Suite 200
> Kansas City, MO 64111
> Telephone: (816) 931-2700
> Email: dlolli@DysartTaylor.com
>
> **HARWOOD FEFFER LLP**
> Robert I. Harwood
> Daniella Quitt
> 488 Madison Ave., 8th Floor
> New York, NY 10022
> Telephone: 212-935-7400
> Email: rharwood@hfesq.com
> Email: dquitt@hfesq.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*